## BURBANK, Adm'r, v. ROCKINGHAM MUTUAL FIRE INSURANCE COMPANY.

Where the charter of an insurance company provided that if the property insured should be alienated by sale or otherwise, the policy should become void—*held*, that the death of the assured, intestate, did not work an alienation of the property, and that the policy did not thereupon become void.

If a party enter into a written agreement in term time, admitting any matter material to the issue to be tried, and entitling the agreement as of the cause—in the absence of fraud in obtaining the agreement, it will be held conclusive as to the matters it contains.

Where the charter of an insurance company provided that in case of a double insurance, without the assent of the company, the policy should be void, and A., owning a certain mill, gave a bond to B. for an undivided half of it, and B. gave a bond back, agreeing to keep it in repair, and also subsequently agreed with A. that he might obtain an insurance on the same, at B.'s expense, to secure A. for the payment due, and A. obtained an insurance upon the whole property—*held*, that the insurance effected by A. was not a double insurance within the meaning of the charter.

ASSUMPSIT, by the plaintiff, as administrator of the estate of Samuel Burbank, of Limington, in the State of Maine, on a

Burbank *v.* Rockingham M. F. I. Company.

policy of insurance against loss by fire, issued by the defendants to said Samuel Burbank, the intestate, on the 10th day of February, 1845, insuring six hundred dollars on his grist-mill, in Limington, for six years. The declaration alleged a total loss by fire on the 13th of February, 1847. There was also a count for one thousand dollars, money had and received.

Plea, the general issue.

It appeared on the trial that the property insured was totally destroyed by fire on the 13th of February, 1847; that due notice was given of the loss; and that Samuel Burbank died on the 24th day of September, 1845.

In his application for insurance Samuel Burbank stated, in answer to a printed interrogatory, that the premises insured were unincumbered.

By the policy, the defendants promised and agreed " to insure Samuel Burbank, and his heirs, executors, administrators and assigns, the aforesaid sum upon the said property, against loss or damage by fire, subject to the provisions and conditions of the charter and by-laws of said corporation," thereto annexed.

The twelfth section of the charter provides, " that when any house or other building shall be alienated by sale or otherwise, the policy shall thereupon be void, and be surrendered to the directors of said company to be cancelled."

The fifteenth section provides, " that if insurance on any house or building shall be and subsist in said company, and in any other office, or from or by any other person or persons at the same time, the insurance made in and by this company shall be deemed and become void, unless such double insurance subsist with the assent of the directors, signified by indorsement on the back of the policy, signed by the president and secretary."

The eighteenth article of the by-laws is as follows : " The applicant for insurance shall make a true representation of the situation of the property on which he requests insurance, so far as concerns the risk and value thereof, and of his title and the interest therein ; and in case the application is made through an agent, the applicant shall be held liable for the representation of such agent."

By an agreement in writing, entitled in this cause of September term, 1849, the defendants admitted that the property insured by the policy was owned by Samuel Burbank at the time of the execution of the policy, as set forth in his application.

On the 9th day of August, 1847, the directors of the company passed a vote as follows: " Voted that James M. Burbank, administrator of the estate of Samuel Burbank, of Limerick, Maine, be allowed the sum of four hundred dollars in full of the loss of grist-mill, February 13th, 1847, and insured in this office by policy No. 13.028, and that the sum of forty-four dollars and thirty-seven cents be deducted for the unexpired time of his premium note."

On the 30th day of August, the directors passed a vote rescinding their former vote, voting that they had since received information " that the assured had not a title in fee simple, unincumbered, to the mill insured, and to the land covered by the same, but that he had a less estate in the same."

There was no evidence that the plaintiff had any knowledge or notice of either of these votes until after he brought this suit.

On the 8th day of January, 1844, the intestate, Samuel Burbank, owned the premises insured, in fee simple, and on that day gave his bond to Jabez Hobson, Sewall Hobson and Samuel S. Bangs, with condition that the obligor should convey to the obligees one undivided half of the premises for eight hundred sixty-five dollars and forty-five cents, to be paid in six annual payments, according to the promissory note of the obligees.

On the same day the two Hobsons and Bangs gave Samuel Burbank a bond with the following condition: " The condition of this obligation is such, that the above bounden Jabez Hobson, Sewall Hobson and Samuel S. Bangs, have this day purchased of the said Samuel Burbank one half of a grist-mill and privilege, and one half of certain buildings and lot, situated at Steep Falls, in said Limington. Now the said Jabez Hobson, Sewall Hobson and Samuel S. Bangs agree and obligate themselves, their heirs and assigns, to put their half of the said grist-mill in

thoroughly good repair, by so improving the same that both runs of stones may operate at the same time, and otherwise so improve the mill that it shall at all times be in a good condition for business; and also, if the said grist-mill should at any time be destroyed by fire, water or otherwise, or any appurtenance of the said mill should be destroyed in any such way, the said Jabez Hobson, Sewall Hobson and Samuel S. Bangs agree and obligate themselves, jointly and severally, their heirs and assigns, to rebuild and put the same in order as soon as may be after such accident may happen—that is to say, the said Jabez Hobson, Sewall Hobson and Samuel S. Bangs are to keep their half of the said grist-mill in operation, and in good order, until they shall have fully paid for the same, agreeably to the provisions of a bond which the said Burbank has this day given to the said Jabez Hobson, Sewall Hobson and Samuel S. Bangs, in relation to the sale of said mill. The said repairs to be made early in the ensuing spring. Now if the said Jabez Hobson, Sewall Hobson and Samuel S. Bangs shall faithfully perform their obligations, as above severally expressed, then this obligation is to be void, otherwise to remain in full power and virtue."

At or about the time when these bonds were given, it was verbally agreed between Samuel Burbank and the Hobsons and Bangs, that Burbank should procure an insurance on the property for their benefit.

On the 31st day of January, 1845, the Hobsons and Bangs gave to Samuel Burbank the following writing: " We, the subscribers, hereby severally agree that Samuel Burbank may procure an insurance of three hundred dollars on that half of the grist-mill at Steep Falls which we bought of him, in such a company, and on such terms as he may think proper, and we jointly and severally agree to pay the expenses that may arise in consequence of effecting such insurance, such as the assessments that may be made on the premium note that he may give, or expenses that otherwise may occur; and we further agree that if a loss should be sustained by fire, the insurance money shall be applied to the use of said Burbank, in payment, so far as it

may go, of what we owe said Burbank; and if we should not owe said Burbank so much as he may receive, the balance is to be returned to us."

On the 6th of August, 1846, the defendants received of the plaintiff nine dollars and sixty cents for assessment on the premium note of Samuel Burbank, and gave to said plaintiff a receipt, signed by their treasurer, as follows:

" Rockingham Mutual Fire Insurance Company, Exeter, N. H. Received of Samuel Burbank nine dollars sixty cents, of James M. Burbank, administrator, being the amount of the assessment ordered by the directors of the Rockingham Mutual Fire Insurance Company, August 3d, 1846, on premium note number 13,028."

On the back of the receipt was a statement of the losses for which the assessment had been made, among which were sixteen thousand two hundred eighty-nine dollars and twenty-eight cents, which happened subsequently to the decease of said Samuel Burbank, viz., between October 3d, 1845, and April 17th, 1846, inclusive.

The defendants contended:

1. That the contract of the Hobsons and Bangs, by their bond, was another insurance, and that the policy was void for that reason.

2. That the death of Samuel Burbank, and the descent of the title to his heirs, was an alienation within the meaning of the charter.

3. That as the vote allowing the four hundred dollars was not communicated to the plaintiff till the vote rescinding it, no inference could be drawn from it in favor of the plaintiff.

The court, for the purpose of the trial, overruled the objections, and the jury returned a verdict for the amount of the loss.

The counsel, in the argument of the case, stated that there was no dispute that the value of the property was such as to warrant the jury in returning a verdict for the six hundred dollars, if the plaintiff was entitled to recover.

The defendants moved to set the verdict aside, and for a new

Burbank *v.* Rockingham M. F. I. Company.

trial; and the questions arising upon the motion were transferred to this court for determination.

*Wells*, (with whom was *Christie*,) for the defendants. The defendants rely upon the several points made in the case. They also contend that Burbank was bound to disclose the true state of the title to, and interest in, the property insured. This was required by the eighteenth article of the by-laws, but was not done. He should have disclosed the equitable title which his bond for a deed to the Hobsons and Bangs gave them. That bond gave them an insurable interest in the property. *McGivney* v. *The Phœnix Fire Ins. Company*, 1 Wendell's Rep. 85; *Columbia Ins. Company* v. *Lawrence*, 2 Peters' Rep. 25.

The death of Burbank was an alienation. 2 Greenleaf's Cruise 131; *Baxter* v. *Bradbury*, 20 Maine 260.

The action should be in the name of the persons to whom the claim, if any, passed, and not by the administrator.

*Marston* and *Emery*, for the plaintiff. The defence make two points: First, that the death of Samuel Burbank and the descent of the property to his heirs is such an alienation as is contemplated in the twelfth section of the defendant's charter, and avoids the policy. The plaintiff contends that descent is not an alienation of the property, either in the common or legal acceptation of the term. Tomlin's Law Dic., Tit. Alienation.

The company could not have understood descent to be an alienation, for by the terms in the body of the policy they insure Samuel Burbank, his heirs, executors and administrators.

The defendant's second position is, that the bond of the Hobsons and Bangs to Samuel Burbank, by which they contracted to keep the premises in repair, and to rebuild in case of loss by fire, is a double insurance, which avoids the policy. To this we reply: first, that there was no double insurance, because the bond cannot be considered an insurance any more than a covenant to keep in repair would be in a lease between the same parties.

We say, in the second place, that the bond covered only one

half of the property—the insurance was upon the whole. The bond and insurance, therefore, did not cover precisely the same thing or the same subject. 1 Arnould's Ins. 291 ; 12 Mass. Rep. 218 ; 5 Hill's Rep. 298.

Third: The insurance was made for the benefit of the Hobsons and Bangs. Samuel Burbank gave to them a bond that he would convey one half to them upon their paying him their promissory notes given on the same day, for the property. The Hobsons and Bangs, or some of them, went immediately into possession of the property, having on the same day given the bond to keep in repair, rebuild, &c., and at the same time a verbal agreement was made that Samuel Burbank should get the premises insured for their benefit, because he had the legal title and was the only one who could effect an insurance. Afterwards, January 31st, 1845, this agreement was reduced to writing, and provided that in case of loss the amount received as insurance should be applied on their notes to Samuel Burbank. On the 4th of February, 1845, the application was made for insurance, and the policy issued on the 10th of the same month. Now the plaintiff contends, that it is evident that Samuel Burbank procured the insurance under this agreement as to one half, and as to the other half for his own benefit; and that as he would be obliged to apply the insurance money upon the notes of the Hobsons and Bangs, there was no double insurance—there was no possibility of Samuel Burbank's getting pay twice for his property; that as to one half, Samuel Burbank was trustee for the Hobsons and Bangs.

If the opinion of the court should be against the plaintiff upon these points, still he says he is entitled to recover four hundred dollars under the money count, for the reason that the vote of August 9th, 1847, admits that amount to be due to the plaintiff.

The plaintiff further contends that he can maintain the action as administrator, because the policy in the body thereof insures Samuel Burbank, his heirs, executors and administrators, for six years: That for a loss happening after the death of the insured, and during the time covered by the policy, the administrator is

Burbank *v.* Rockingham M. F. I. Company.

the only proper person to bring the suit: That the company received from the plaintiff, as administrator, assessments for losses happening after the death of the insured, and thereby recognized the insurance as existing, and admitted their liability to pay to him as administrator, in case of loss; and that the vote of August 9th, 1847, admitted the right of the plaintiff to recover.

*Christie*, in reply. The point, whether or not the action can be maintained by the administrator, does not appear to be distinctly raised by the case, but we think it may be fairly considered as raised.

To whom does the contract survive? To the heirs, or to the administrator? We say to the heirs—the property passes to them. Upon what principle, then, can an action be maintained by the administrator, if the cause of action survives to the heirs? Upon none. The action should have been brought by the heirs.

The other side contend that because we have insured the heirs, executors and administrators, we are liable to the administrator. But we have also insured the " assigns," and therefore the agreement proves too much. This view shows clearly that no fair argument can be drawn from this clause of the charter. I wish to refer the court, on this question, to the second section of the charter.

In regard to the payments after the assessments made for losses occurring subsequent to the decease of Samuel Burbank, we say that the defendants did not know that Samuel Burbank was not still alive, and it cannot be fairly inferred that James M. Burbank is a party with whom the company have recognized this contract.

The word " otherwise," in the twelfth section of the charter, covers all kinds of alienation. If descent from an owner to heirs is an alienation, then this is an alienation; and we say descent is an alienation.

The vote of the corporation to pay four hundred dollars, is a mere offer, and until accepted is of no binding force, and may be revoked. In this case it was revoked before suit brought.

EASTMAN, J.   The contract of insurance which was entered into by the defendants in this case, was made subject to the provisions and conditions of the charter and by-laws of the corporation.   The twelfth section of the charter provides, " that when any house or other building shall be alienated by sale or otherwise, the policy shall thereupon be void, and be surrendered to the directors of said company to be cancelled."   The provisions of this section, as well as those of the others, are a part of the policy issued.   *Roberts* v. *Chenango Ins. Co.*, 3 Hill's Rep. 501 ; *Houghton* v. *Man. Mu. Fire Ins. Co.*, 8 Metcalf 114 ; *Jennings* v. *Chenango Co. Mu. Fire Ins. Co.*, 2 Denio 75.   And the first question which we propose to consider is, had the property insured become alienated, within the meaning of the charter, by the death of Samuel Burbank, the assured.

To alienate is to transfer the property in anything to another ; and an alienation is to make a thing another man's ;—to alter the possession from one to another.   Such are the definitions given in the old books.

As understood at common law, to alienate real estate is voluntarily to part with the ownership to it, either by bargain and sale, or by some conveyance, or by gift or will.   The right to alienate was a right which the owner had over the real estate, to divert it from the heir.   Alienation differs from descent in this, that alienation is effected by the voluntary act of the owner of the property, while descent is the legal consequence of the decease of the owner, and is not changed by any previous act or volition of the owner.   A sale and conveyance is an alienation that takes effect from the time of the transfer, while a devise is an alienation that takes effect on the decease of the testator, according to the terms of the will.   But property not transferred or devised is not alienated, according to the principles of the common law.   There is, however, a species of involuntary alienation, so made by the statutes of 13 Edward I., and 27 Edward III., by which the land becomes answerable by attachment and extent for the debts of the owner.   The doctrine and principles of alienation will be found discussed in 4 Kent's Com. 441, and 2 Black. Com. 287.

Unless then there shall be something in the signification of the term " alienate," as used in the twelfth section of the charter, differing from the common law meaning of the word, the property did not become alienated by the death of the assured, and consequently the policy would not be made void thereby.

We have, therefore, examined the policy, charter and by-laws, with some attention, to see if we could discover any good reason or principle for extending the construction of the term " alienate" beyond its common law signification, and we have been unable to find either. The contract of insurance ought not to be terminated by the company, except by the express terms of the policy or the prohibited act of the insured. If the assured conveys the property, there is good reason why the insurance should cease. So in case it shall be devised; for the grantee or devisee can at once procure it to be insured. The company, too, have not contracted with either, and they might not be disposed to insure either. But where the property passes into the hands of an administrator, and is held by him for the creditors or heirs, who may be numerous and scattered, the same reason does not exist. It would in many instances be difficult if not impossible for them personally to effect an insurance, and it could only be done by the administrator for their benefit; and, in such instances, the property would necessarily be uninsured during the time intervening between the death of the assured and the appointment of the administrator. It is also a pertinent inquiry, whether the provision in the policy insuring the assured, *and* his heirs, executors, administrators and assigns, would not be entirely nugatory if the death of the assured operates, *ipso facto*, as an alienation of the property. The provision in the charter, requiring the assent of the directors in order to make an assignment or transfer valid, does not render void the other provision by which the assigns are insured. It only points out the course to be taken to make the assignment effective.

In this case it is worthy of remark, that the defendants do not appear to have considered the death of Samuel Burbank as operating as an alienation of the property, till after the commence-

ment of this suit. They made assessments and received the amount assessed against the property of James M. Burbank, the administrator, and gave him a receipt therefor. They voted to pay the administrator four hundred dollars, in full for the loss of property; and in their subsequent vote, rescinding the former one to pay, they did not place the rescission upon the ground that the property had become alienated, but upon the ground that they had received information that the assured had not a title in fee simple, unincumbered, to the mill insured, but that he had a less estate in the same.

Were it necessary, also, for a decision of the case, an inquiry might likewise be instituted into the assessments made prior to the loss of the property, and subsequent to the death of Samuel Burbank, and collected of the administrator. Where the property has not been destroyed, but passes in some way into the hands of another, the policy is either void, or not, from the day that the property changes hands. If void, ought it not to be alike so for both parties? The assured should be liable for his proportion of all losses and expenses up to that time; but as the company have paid nothing, so as to create a liability upon him during the whole term of the insurance, there would seem to be no principle that should make him holden to pay for subsequent losses, if the company is not also liable to him, or to the person holding the policy, for the destruction of the property insured. If the property is actually alienated, nothing can be recovered on the policy for anything that occurs subsequent to that time; and ought the company to have any claim upon the assured for losses after that date? If they ought not, then if they make and collect assessments for losses that subsequently occur, with a knowledge that the property has been transferred, should it not be held that they elect to continue in force the policy?

But without pursuing the question of alienation any further, we have no hesitancy in holding that the property did not become alienated by the death of Samuel Burbank, and that the descent of the title to the heirs, if there were any, was not an alienation, according to the principles of the common law, nor within the meaning of the charter.

The representation of the title and interest in the property, as required by the eighteenth article of the by-laws, was not strictly correct. The article requires that the "applicant for insurance shall make a true representation of the situation of the property on which he requests insurance, so far as concerns the risk and value thereof, and of his title and interest therein." The insurance was made February 10th, 1845, and was to Burbank alone. The application stated the property to be Burbank's, and that it was unincumbered. In the strict technical sense of the phrase, it was his, and it was unincumbered; while, at the same time, the Hobsons and Bangs had a bond of one undivided half of it. Their interest was such as could have been taken by an extent. (*Edgerly* v. *Sanborn*, 6 N. H. Rep. 397 ; *Pritchard* v. *Brown*, 4 N. H. Rep. 397.) It was an equitable interest, and such as could have been insured. (*Columbia Ins. Co.* v. *Lawrence*, 2 Peters' Rep. 25 ; *McGivney* v. *Phœnix Fire Ins. Co.*, 1 Wendell 85.) And Burbank should have stated the situation of the property, just as it was. Had he done this, the company would probably have made the insurance quite as readily, and no defence of misrepresentation could have then been made.

But whatever would be held to be the effect of the representation that was made—whether it would have rendered void the policy or not—the objection, whatever its force, was cured by the agreement entered into September term, 1849. The defendants, by that agreement, admitted that the property insured by the policy was owned by Samuel Burbank at the time of the execution of the policy, as set forth in his application. This agreement, being made in term time, becomes part of the record, and is, as the books term it, a solemn admission of the fact. *Doe* v. *Bird*, 7 Car. and Payne 6 ; *Langley* v. *Ld. Oxford*, 1 Mees. & Wels. 508 ; 1 Greenl. Ev., §§ 27 and 186. It is an admission that there was, in truth, a correct representation in the application, of the title and interest of the assured in the property.

Burbank could have effected an insurance upon the whole property, according to the agreement of the Hobsons and Bangs,

if the company would take the risk ; and as he probably acted in good faith in making the application, supposing that he had a right so to do, it was by no means discreditable in the company to make the admission which they did.

Nor can the position that there was here a double insurance be successfully maintained. The fifteenth section of the charter provides, " that if insurance on any house or building shall be and subsist in said company, and in any other office, or from or by any other person or persons at the same time, the insurance made in and by this company shall become void, unless such double insurance subsist with the assent of the directors, signified by indorsement on the back of the policy, signed by the president and secretary."

There is no pretence that this property was insured in any other company, nor was there any other person than Burbank insured by this company, unless it were the Hobsons and Bangs. Only one policy was issued, and that was to Burbank. The amount taken upon the whole property was only six hundred dollars, while the consideration agreed to be paid by the Hobsons and Bangs for the one undivided half, was eight hundred and sixty-five dollars and forty-five cents. There was, then, no excess of insurance ; no application by the Hobsons and Bangs for an insurance ; no policy issued to them ; and nothing that could be construed into a double insurance, unless it were the agreement of the Hobsons and Bangs, made on the 31st of January, 1845, that Burbank might procure an insurance of three hundred dollars upon what they termed their half of the mill, at their expense, as security in fact to Burbank for the amount for which they were at that time indebted to him. Now we think there can be no doubt that this was not such a double insurance as the charter contemplates. It was a mere agreement between those who were interested in the property, entered into without any appearance of fraud, and to the injury of no one. The Hobsons and Bangs can have no claim upon the company, for the company made no contract with them. If they have a claim upon any one, it can only be upon the plaintiff, by virtue of the agreement made between them and Samuel Burbank.

Burbank *v.* Rockingham M. F. I. Company.

It is hardly necessary to allude to the verbal agreement made between Burbank and the Hobsons and Bangs, in 1844, about the time the bonds were given, since that agreement must have been superseded by the written one that was executed in January, 1845, a short time before the insurance was effected.

It is stated in the argument that this suit cannot be maintained by the administrator. But no question of that kind is raised in the case, and none is properly before us. The property destroyed was situated in the State of Maine ; and what the statutes of that State are, as applicable to cases of this kind, does not appear. If before us, they might show that the administrator had the control of the rights occuring under the policy, and that he was the proper person to institute the suit.

Had the property destroyed been situated in this State, so that the question would have to be determined by our laws, we might perhaps inquire whether the administrator had not such an interest in the policy, as trustee for the creditors or heirs, or both, and also to recover compensation for his own services, as would enable him to bring the suit.

But it is not necessary to determine the question suggested in the argument, as it is not raised by the case. Neither is it necessary, in the view which the court have taken of the plaintiff's right of recovery, to consider at all the effect of the vote of the directors to pay four hundred dollars in full for the loss. Our opinion is, that the plaintiff's right of action is complete without any reliance upon that vote ; that the defence set up cannot be sustained, and that there must be

*Judgment on the verdict.*